## STRONG v. WEIR.

1. A DEMURRER will not be sustained, if the complaint shows that the plaintiff is entitled to *any* relief whatever.
2. NONSUIT—EQUITY.—A nonsuit is not proper in an equity case.
3. GIFTS.—The law of gifts does not apply, except where there is an actual delivery to the donee, or some one for him.
4. TRUST—DONOR AND DONEE.—Where money is given to a third person to be invested for the benefit of another, without control of the donor, a *complete trust* is created, and it cannot be revoked by the donor afterwards instructing the holder not to invest the money as formerly instructed.

Before BENET, J., Winnsboro, March, 1895.   Reversed.

Action by T. E. Strong, as executor of Jesse Beam, against Thomas Weir, David Weir, jr., David J. Weir, and Sarah J. Weir. The pleadings are fully stated in the opinion. The issues were referred to J. C. James, special referee, who made the following report:

There was considerable testimony taken, amounting to something like forty pages, but much of it was cumulative, and the real important facts can be put in a small space. The plaintiff, Jesse Beam, is a feeble old man, slow of speech, and whose memory is impaired; but I can't go as far as the defendant's attorney, and say that he is childish or that his intellect is impaired, but he is fully competent to attend to ordinary business. Some time in November, 1891, the plaintiff was at the house of his son, Elijah Beam, and the defendant, Thomas Weir, was also there; while there, these three entered into a verbal agreement for the "old man," the plaintiff, to dispose of his property in the following manner: He was to give to his daughter, Mary Peay, the home place, containing about 112 acres, and she, in return, was to allow him to make that his home, though he reserved the right to stay with either of the others if he desired, and she was to pay him $20 per year. He was then to sell the ninety-seven acre tract, put his rent money with the proceeds, and then buy a place with $500 of the

money for his son Elijah, and with the other $500 buy a
place for his daughter, the defendant, Sarah J. Weir, and
they were each to pay him $20 per year, and he was to have
the privilege of staying with either of them when he desired.
The defendant, Thomas Weir, told them at this meeting
that he knew a man that would give $800 for the ninety-
seven acre tract. He testified on the trial that some time
before this meeting his grand-father had told him that he
wanted to divide out his property so as to give each of his
children a home and also get a living for himself, and that
he advised his grand-father against it—but I don't think he
was sincere in this advice, as he immediately went to look-
ing out for a purchaser for some of the property, so as to
enable him to make the division. Had he been honest in
his opposition, he would have told the "old man" that the
only way he could compel his children and grand-children
to treat him properly would be to hold on to his property
himself. After the meeting at "Lige's" house, at which
neither Mary Peay nor Sarah Weir were present, Lige de-
cided that, instead of letting his father sell the ninety-seven
acre tract of land and giving him $500 of the money, he
would take that tract and pay his father $300 on it, which
sum his father would invest, together with the money he
got from his rent, in a place for Sarah. Jesse Beam agreed
to this change, and he and Lige and Thomas Weir, the de-
fendant, went to Blackstock, and there he executed and
delivered to Elijah a deed for the ninety-seven acre tract
of land, which was, as expressed in the deed, upon the con-
sideration of $300. None of the money was paid down,
and the understanding was that it would be paid as soon as
the rent money was collected, and would be used in pur-
chasing a home for Sarah. On the same day Jesse Beam
had a letter written to Sarah, or rather to Sarah and her
husband, advising them that he had decided to divide out
his property, and that they would get $500 to put into the
land, and saying to them to make the arrangements and he
would have the money. He was unable to write himself,

and the letter was written by Elijah's wife. Thomas Weir was also there and had something to do with the letter. Mr. Beam swears that he had the letter written for the reason that he could not write himself, and says that what he intended to say was that he meant to help them to get a home, and to ask them what that "Cohen place" could be bought for. I am inclined to think that the "old man's" ideas were not properly expressed in the letter, and that Thomas Weir, the defendant, who was there when the letter was written, and who impressed me as being something of a schemer and as a man who had his eye on the main chance, "had something to do" with the contents of the letter, but the letter is here, and its contents are as I have stated. To this letter no reply was ever received, and Mr. Beam swears positively that Sarah and David never accepted his plan for the division, but that Sarah refused to help support him or to give him the $20 a year. This was not contradicted, though David was at the reference. The only testimony that conflicts with it is the statement of Elijah, who said in his testimony that he saw his father with David and Sarah in January, and heard him say to them that he would have $500 to put into a place, and that when they got ready they must let him know, and he would bring it or send it. I am, under these circumstances, obliged to find that the agreement as stated in the letter, was not accepted by the defendant, Sarah Weir. A deed to the "home place" was made and delivered to Mary Peay by the plaintiff, and he has been living there since, so that she accepted the divide. Elijah had attended to the business of the plaintiff—that is, collecting his rents, selling his cotton, etc.—for a number of years, and after this agreement had been made among some of the parties, the plaintiff sent his tenant to Elijah with the rent cotton for Elijah to sell, as had been his custom. Elijah sold the cotton and paid the proceeds, and also the $300, to Thomas Weir, although he says himself that his father's directions to him were to pay it to Jane Weir to be invested in a place for her; he says that he paid the money to Tho-

mas Weir in December, and that his father demanded that the money be paid to him on the 8th January, 1892. His exact statement is that his father never told him to give him the money, but that they met on the 8th of January, and his father then demanded a settlement. It was just about this time that Sarah Weir and her husband came up to see the "old man," and, as he says, they did not take to his plan of making a divide, and it is possible and in reality the whole trouble began just then. Thomas Weir, although the "old man" swears that he was not his agent, I believe from the testimony, from his connections with the various parties in the case, and from the circumstance that he did act in that capacity to a certain extent. Elijah Beam testified that there was a written authority to Thomas from the plaintiff, but this writing, if there was one, was not produced, and under the rule it must be held that its being withheld is a circumstance going to show that it would be against Thomas Weir's interest if it were shown.

I am satisfied that at one time the plaintiff fully intended putting the $465 that he got from Elijah and from his rent cotton into land for the defendant, Sarah Weir, and that he meant to consult Elijah and also Thomas Weir about it, but I am equally as well satisfied that he had never decided upon any particular tract, and that he never intended to allow Elijah and Thomas to go and buy any place they saw fit, without consulting him. This is shown conclusively by the fact that when Thomas Weir got ready to go to Winnsboro to fix up the title, he went to see the plaintiff, although there was then a breach. The plaintiff then demanded from Thomas Weir his money, $465, and told him not to buy land with it. Thomas Weir admitted having the "old man's" money in his pocket, but when he was asked for it, cursed him and told him he could not get it. Thomas Weir then went to Winnsboro, and holding himself out as the "managing agent of Jesse Beam's estate," bought the tract of land described in the complaint, paying for it in part with the money belonging to the plaintiff, amounting to $465, and

having the title made to his father and mother for life, with remainder in fee to himself and brother. The amount of $20 which Sarah was to pay plaintiff has not been paid. There is some testimony that it was tendered, though it was not enough to make it a legal tender. The defendants are all poor, and have no property besides this tract of land.

(*a*) The contention of the plaintiff is: That the circumstances under which the defendants got the land make them trustees for him. This was well and carefully argued by plaintiff's attorney. (*b*) The defendants contend that at the time the tract of land was conveyed to Elijah Beam, and he agreed, as they contend, to pay the $300 excess to Sarah J. Weir for her benefit, and the plaintiff also agreed, as they contend, that the money which he got from his rent cotton should go to her, that the plaintiff had nothing further to do with it, and it was an executed contract—a complete gift. This was ably and forcibly presented by the defendant's attorney, and I think it is good law; but the facts don't support it, and I believe with the plaintiff that the defendants are his trustees, and that he is entitled to the relief sought. I recommend that the land be sold, and out of the proceeds the plaintiff be paid his $465.

This report came before Judge Benet on numerous exceptions. He overruled them all and confirmed the report.

The defendants appeal on the following exceptions to the decree of his Honor, W. C. Benet, herein filed, for error in overruling the exceptions, as follows:

1. *Of law:* (*a*) In overruling the demurrer of each of the defendants. (*b*) In refusing the motion for nonsuit of each of the defendants. (*c*) In holding that defendants are trustees for plaintiff. (*d*) In refusing to hold: 1. That to make defendants trustees, it must appear that they all stand in some fiduciary relation to the plaintiff. 2. That the payment of the money by the plaintiff must appear by clear and unequivocal evidence. 3. That it was his money at the time of payment. 4. That the proof must be by two

good witnesses, or one witness with strong corroborating circumstances. 5. That the plaintiff is under no natural or moral obligation to provide for the defendants. 6. That defendants being the children and grand-children of plaintiff, no trust will arise. 7. That the smallest consideration would defeat trust. 8. That a trust must be alleged not only in terms, but all the facts in the bill. (*e*) In refusing to hold that the transaction was an executed contract, or which equity will treat as executed. (*f*) In refusing to hold that a payment to Thomas Weir for the use of Sarah Weir was payment to her. (*g*) In refusing to hold that because of neglect, the plaintiff cannot now invoke the aid of equity. (*h*) In holding that there was no tender of the $20. (*i*) In refusing to hold that defendant, Sarah, having written notice of the contract for her benefit, it could not be revoked without notice to her, or default on her part at the time the $20 became due.

2. *Of fact in finding:* (*a*) That the complaint alleges, in substance, that the defendant, Thomas Weir, while acting as agent of the plaintiff, received certain moneys. (*b*) That the answer admits that Thomas Weir received the money as stated in complaint. (*c*) That it was in November that plaintiff made his arrangements to divide his property. (*d*) That he reserved the right to live among the defendants as he pleased. (*e*) That Thomas Weir told them at the first meeting that he knew a man who would give $800 for the ninety-seven acre tract. (*f*) That Thomas was insincere in his advice, as he went to look for a purchaser immediately, and because he did not advise the old man to hold to his property. (*g*) That none of the money was paid down, and that the understanding was that it was to be paid when the rents were collected. (*h*) That Thomas Weir was also there and had something to do with the contents of plaintiff's letter, because he impressed the referee as a schemer. (*i*) As a significant fact, that no reply was received to plaintiff's letter of October, when the defendants, to whom it was addressed, visited plaintiff af-

terward in November. (*j*) As a significant fact, that David was at reference and did not testify. (*k*) That Elijah stated that he saw his father with David and Sarah in January, when he stated it was in November. (*l*) That the statement of plaintiff is not contradicted, when his own conduct contradicts or waived it, in going afterwards to Blackstock to give Thomas written power to handle the money for his mother; directing rents to be paid to him; not demanding the money from Elijah; in not withdrawing his previous instructions to Elijah to pay it to Thomas for his mother; in telling Halsell to take rents to Thomas and Elijah, all the business was in their hands; in telling Sarah and David in November to buy the land, and he'd come down or have the money ready, and in testifying at the reference that he wanted the money for himself to buy a place for Sarah, and in not demanding the money from Thomas. (*m*) That Sarah and David visited the plaintiff about the 8th January, and did not take to the plan of making the divide. (*n*) That although the plaintiff, Thomas, was not his agent, still he was, in some sense, his agent. (*o*) That Elijah swears there was written authority to this from plaintiff. (*p*) That this writing, if there was one, and under the rule (what) that it being withheld is a circumstance going to show that it would prejudice Thomas' interest. (*q*) That plaintiff had not decided upon any particular tract, and that he never intended to allow Elijah and Thomas to go and buy any place they saw fit without consulting him, as conclusive from the circumstance that when Thomas got ready to go to Winnsboro to fix titles, he stopped to see the plaintiff in passing, and that there was then a breach (of what, a trust). (*r*) That the plaintiff there demanded of Thomas Weir the money, $465. (*s*) That defendants are all poor, and have no property except this land. (*t*) That defendants' counsel contended that it was a complete gift.

3. *Of fact in not finding:* That in the spring of 1891, the plaintiff consulted with his son, Elijah, and grand-son, Thomas Weir, about dividing his property among his chil-

dren in such a way as to secure a home and support for himself and homes for each of his children. His children are Sarah Weir, Elijah Beam, and Mrs. Peay. In October, same year, at Elijah's, with son, Elijah, and defendant, Thomas, agreed with them, in behalf of his children, to deed the 112 acre tract to Mrs. Peay, and make that his home, and sell the ninety-seven acre tract for $800 (which Elijah agreed to take afterwards), pay $500 to Elijah and $300, with rents, making $500, to Thomas for Sarah Weir. Elijah agreeing afterwards to take the ninety-seven acre tract and pay $300 for Sarah, with rents, to be invested by Thomas in the premises described in the complaint, according to directions in letter of plaintiff to David and Sarah Weir of October, apprising them of this agreement, directing the character of the titles.

When Elijah's titles were being executed, Mr. Thompson told him to give note to Thomas for Sarah, as the land was now his. Thomas replied, he needed no note, he could trust his uncle, in which the plaintiff concurred. The titles to Mrs. Peay was to have been made on the same day, but Elijah thought it necessary for her to be present; deed was made to her in November. The money for Sarah could not then be invested in the premises of the complaint because of the absence of Mr. Cohen, who held a mortgage, and rents were not paid. In November defendants, Sarah and David, visited plaintiff and the matter was discussed; Thomas and Elijah agreed to take the premises of the complaint named in plaintiff's letter. The plaintiff after this sent tenant to Elijah, saying he had nothing more to do with the business, it was all in their hands. Elijah, under his previous instructions, paid his own with proceeds of tenant's rent, with $300 borrowed from MacDonald, to defendant, Thomas Weir. About this time Mrs. Peay moved in to live with plaintiff. After this, some time in December, the defendant, Thomas, having made arrangements, being on his way to Winnsboro to complete the titles to the tract of land of the complaint, went by to take the plaintiff, when he forbid his putting the

money in the land, but made no formal demand for payment to himself. The money was invested in the land according to plaintiff's letter. In the spring of 1892 the defendants, David and Thomas, offered to pay plaintiff the $20 agreed upon, which he refused. There was no fixed time for the payment of this $20, except it was due in 1892.

*Messrs. Henry & Gage*, for appellants, cite: *Trust:* 2 Pom. Eq. Jur., 628; 30 S. C., 41; 1 Perry on Trusts, secs. 125, 128, 135, 137; Code, 228, sub. 1; 15 S. C., 268; 32 S. C., 595; Bouvier, 711; 19 S. C., 135.

*Messrs. Barber & Marion*, contra, cite: *Gift:* 8 A. & E. Ency., 1313, 1314, 1318; Thornton on Gifts and Advancements, 64, 66, 75, 104, 105, 109, 110, 141, 142, 254, 513, 515, 533; 105 Pa. St., 258; 1 N. & McC., 237; 28 S. C., 268; 5 Rich. Eq., 15. *Trust:* Perry on Trusts, secs. 127–8, 135, 137, 148; 2 Pom. Eq. Jur., secs. 155, 1030–1, 1041–2; Story Eq. Jur., sec. 1201; 1 Rich. Eq., 426; 6 S. C., 90; 19 S. C., 135, 177; 21 S. C., 481; 23 S. C., 251; 27 S. C., 39; 31 S. C., 60; 32 S. C., 107; 32 S. C., 590.

July 22, 1896. The opinion of the Court was delivered by

MR. JUSTICE GARY. The allegations of the complaint herein are substantially as follows:

1. That during the year 1891 the defendant, Thomas Weir, received and took possession of the sum of $475.18, which was paid to him by Elijah Beam. 2. That the said Thomas Weir admitted having said sum of money in his possession, and admitted plaintiff's ownership thereof, but positively and wrongfully refused, after demand, to deliver it to the plaintiff. 3. That the plaintiff is an old man, and the said defendant claimed to be, and held himself out to the world, as plaintiff's "managing agent;" but plaintiff avers that such claim is a mere pretense, without plaintiff's knowledge or authority, and contrary to his wishes. 4. That on the 22d day of January, 1892, the said defendant for a consideration of $612.50, paid by the said defendant as "man-

aging agent of the estate of Jesse Beam," purchased from the defendant, David J. Weir, who is the father of the said Thomas Weir, a certain tract of land described in the complaint. 5. That the said deed of conveyance is to Thomas Weir and his brother, David Weir, jr., and contains the following provision, to wit: "I reserve to myself and wife, Sarah Weir, a lifetime interest in said estate, after our death with remainder to Thomas Weir and David Weir, jr." 6. That $476.18 of the money paid for said land belonged to this plaintiff, and was used without plaintiff's authority, and against his express direction. 7. That he is informed and believes the defendants are in the joint possession of said tract of land. 8. That should the Court direct a conveyance of the land by the defendants to this plaintiff, he is unable to pay the difference between the amount of his money used and the total purchase price. (Jesse Beam was the plaintiff when the action herein was commenced, but died thereafter, and the plaintiff abovementioned was substituted in his stead upon the record.)

The defendants answered the complaint, denying the allegations thereof, except as admitted in the following defense interposed by them, to wit: 1. "That during the year 1891 the plaintiff divided his property among his children, with the purpose to secure to each of them a home, and they agreed to pay $20 each for his annual support. 2. That in pursuance of his said purpose he conveyed to his daughter, Mary E. Peay, *nee* Beam, a home place of 112 acres, more or less, and to secure a home for his daughter, Mary Jane Weir, *nee* Beam, the defendant, Thomas Weir, under the directions of the plaintiff, collected from Elijah Beam $300 and $176.18 (the last amount proceeds of rent cotton delivered to said Elijah Beam for that purpose), and invested the same for the said Sarah Jane Weir in a tract of land described in the complaint, following the special instructions of the plaintiff as to character of title." The case was referred to J. C. James, Esq., as special referee, to take the testimony and report upon all the issues, both of law and fact.

The defendants demurred to the complaint, on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was overruled. The following testimony throws light upon the disputed points, which are regarded as material in view of the conclusion at which the Court has arrived. Jesse Beam, the plaintiff, in his testimony, says: "Thomas Weir was not managing my business then and has never managed my business; I never appointed Thomas Weir as my agent to manage my affairs. Thomas Weir admitted having my money in his pocket, and said he would be damned if I should have it; * * * I never authorized Thomas Weir to invest money in land, but told him not to take my money to buy land. * * * Nobody lived with me before Mr. Peay and his wife came to live with me. They have been living with me something over eighteen months. I deeded my home place to Mary shortly after they moved there; it was the understanding before they moved there, that I was to deed the place to her, and they and Elijah and the others were to support me, and each of them was to give me $25 a year. The ones who were to support me and give me $25 a year were Elijah, Mary, and David Weir's wife, Sarah. David Weir's wife refused to support me or give me money, and then I said she should not have any of my money. Elijah also refused · to support me. I deeded the place to Mary because I wanted her to have a home. I deeded eighty-seven acres of land to Elijah in the same way. I had no more land, but Elijah was to give me $300 on the place I deeded to him, and I intended to use that money, together with my rent paid me by Elijah Halsell, in buying a home for David's wife, Sarah, provided they carried out their part of the understanding about providing for me. I went into the arrangement with a view of providing a home for each of my children, and for getting a support for myself. They were to let me live among them, first with one and then with the other, and each was to give me $25 per year. * * * There was no time for the payment of the $25 per year, considered at the time I made the ar-

rangement with my children, but I thought they would give it to me whenever they (I) needed it; they were to give me a written contract, but they never did. I deeded Elijah the eighty-seven acres, notwithstanding he didn't give me the contract. * * * I have never gone to any of the parties and asked them for the money. David Weir offered me $20 last spring, but I didn't take it, as I didn't consider that I had given them any thing for them to give me $20 for. Thomas Weir got it from David and wanted me to take it, but I wouldn't. They didn't tell me what they offered it to me for. * * * Thomas Weir didn't get the money from Elijah on my order. The $300 that Elijah was to pay was to come into my hands, and I didn't give any order for it to be paid to Weir. I wanted the money to buy a place for Sarah J. Weir, but they hampered me and bothered me, and then I said they shouldn't have a cent of my money. Elijah Halsell come and told me my rent was ready, and I told him to take it to Elijah, as I had nothing to do with it now. I don't know whether Halsell brought me the rent before I deeded the eighty-seven acres to Elijah or after. I did not tell my son, Elijah, to sell the rent cotton, and turn the rent over to Weir. There was an understanding before there was any deed made, that I would use the $300, that Elijah was to pay on his eighty-seven acres of land, in purchasing a place for Sarah J. Weir. * * * Elijah attended to my business, and that is why I sent Elijah Halsell to him with my rent cotton. * * * The money that was to be paid to me, that is, the $25, was to be paid some time in 1892." * *

Elijah Beam, a son of the plaintiff, Jesse Beam, in his testimony, says: "In 1891, my father made some arrangements with us about a division of his property; after talking over the matter for some time, in which he said that he wanted to make the division so that he could make a living for himself and have one of his girls to take care of him, and his first idea was to give me and my sister at Long Town $500 apiece, and give the 112 acre farm to my other sister, Mrs. Peay. The way he raised the $500 for me and

my sister was this: Some time after he decided to make the division I have mentioned, he found that he couldn't sell the Pink's place, as was his intention, so he gave that to me for my $500, and required me to pay $300 towards raising the money for my sister, Jane Weir. The balance of the $500 he got from Elijah Halsell for rent, and also rent from me. He gave the home place to Mrs. Peay. The rent from myself and Elijah Halsell was only $165. So that my sister, Jane Weir, did not get quite $500. She did get exactly $465, *i. e.*, $300 that I paid on land, and the $165, the proceeds of rent cotton. The understanding that we had was, that we were to take the advancement, and give to my father $20 each per year. We, that is, Jane Weir, Mrs. Peay, and I, were to pay him the $20 each once every year. I was not to pay anything for the first three years, as I had to pay $300 on my land; but the other two were to pay it from the start. No special time was mentioned for the payment of the $20. It was understood that it would be paid in the fall. I was to pay $300 on my tract to my sister, Jane Weir, and it was to be invested in land for her. I sold the cotton under my father's instructions, and was to pay the money to Jane Weir for the same purpose. I paid the money to Thomas Weir, my sister's son. My father directed Thomas Weir and I to invest the money in land for Jane Weir. My father made me a deed in October to the tract of land I got. He made the deed to me first. He made deed to my sister, Mrs. Peay, for the land she got some time in November or December. I paid the money to Thomas Weir in December. When my deed was made, Mr. Thompson said I ought to give Jane Weir a note for the $300 I was to pay her. Thomas Weir said there was no use for a note, and my father said, 'No, not to make a note.' The arrangement was made in October for this money to be invested in the Long Town place for Jane Weir. My father gave instructions about buying the Long Town place, both in person and by letter. These instructions were given to me and Thomas Weir. The instructions were, that the

property was to go to David Weir and Jane Weir, for life,
and at their death, it was to go to their two sons. The in-
structions by letter were given to David and Jane Weir. The
letter was written by my wife. I was present when it was
written, and it was read over to him by my wife, and after-
wards by Thomas Weir. The letter was written in October,
the same day my title deed was made.  *  *  *  My father
never got a reply to the letter we were talking about awhile
ago. The Weirs came up some time in November. Thomas
Weir came up with the other Weirs. My father went with
Thomas Weir to Blackstock, to give him written notice to
handle the money for Jane Weir. When all this happened,
I had not sold the cotton and had not delivered the money
to Thomas Weir. My father did not ask me to give him
the money, nor did he tell me not to give it to Weir. * * *
I was not present when David Weir and Jane Weir came
up to see my father. I saw them together the next day,
and heard my father say to them to let him know when
they got ready for the land trade, and he would come down,
or that the money would be ready. My father said all along
that he wanted me and Thomas to put the money down in
a place for Jane Weir."

Thomas Weir, one of the defendants, in his testimony,
says: "When Thompson finished writing the deed, he said
to my uncle, 'Now, when you get this title, the land will be
yours, and you ought to pay the money;' my uncle said, 'I
am to get the money from Mr. MacDonald;' and then I
spoke up and said, 'There is no use giving a note, as I am
to·manage the matter for mother, and I can trust you all for
it.'. * * * We decided to get this place from Cohen at the
time of the original agreement. My grand-father under-
stood we would buy this place from Cohen on the very day
of the agreement. We did not buy the place until some
time in January, for the reason that we could not see Mr.
Cohen, and some time in December my grand-father forbid
me spending the money for the land. I had made all ar-
rangements to take this particular place (Cohen place) at

the time my grand-father forbid me to put his money in it.
* * * I had the money with me at the time he forbid me
spending it for the land. He did not demand the money
from me, he simply forbid my spending it. I offered to pay
my grand-father the $20 under the terms of the agreement,
telling what I meant it for. The money tendered him was
gold. * *. * The money for the cotton and from my uncle
was paid to me some days before my grand-father forbid
me putting it into the land."

Elijah Halsell, in his testimony, says: "I told him (Jesse
Beam) as soon as it (the rent) was ready, and he told me to
take it to Mr. Elijah Beam and Mr. Thomas Weir, saying
that all the business was in their hands. * * * I told Mr.
Beam the rent was ready about the latter part of November,
that year."

N. P. Varnadore says: "I was with Mr. Jesse Beam when
he gave the cotton to Thomas Weir; at that time (he said)
that (he) had nothing more to do with it; that he, Thomas
Weir, and Elijah Beam were in charge of it."

At the close of plaintiff's testimony, the defendants moved
for a nonsuit.

The special referee filed his report (which will be set out
in the report of the case), in which he recommended that
the land be sold, and out of the proceeds the plaintiff be
paid his $465.

Numerous exceptions were filed by the defendants to the
report of the special referee. His Honor, Judge Benet, heard
the case upon exceptions to the report of the special referee,
and ordered that the report be confirmed and the exceptions
overruled. His order then provided for a sale of the land
and payment out of the proceeds of the amount claimed by
the plaintiff. The defendants appealed to this Court upon
numerous exceptions, which will be incorporated in the
report of the case.

The first exception complains of error in overruling
the demurrer. A demurrer will not be sustained, if the
allegations of the complaint show that the plaintiff is

1. entitled to *any* relief whatever. The allegations contained in paragraph two of the complaint are, in themselves, sufficient to show that the demurrer cannot be sustained. *Stroman* v. *O'Cam*, 13 S. C., 100.

The next exception imputes error in failing to sustain the motion for a nonsuit. The plaintiff seeks relief within the equitable jurisdiction of the Court, and the law as to nonsuits has no application in such cases. *Woolfolk* v. *Graniteville Mfg. Co.*, 22 S. C., 332.

The conclusion reached by the Court will render it unnecessary to consider the other exceptions *seriatim*. The testimony shows that Jesse Beam did not intend that the money itself should be delivered to Mrs. Sarah Jane Weir, and, therefore, the law as to *gifts* has no application to this case. The testimony, however, shows clearly and unequivocally it was the intention of Jesse Beam that the money should be invested in the Long Town place, or some other place, as a home for Mrs. Sarah Jane Weir, without further control over the money by the said Jesse Beam, and this created a complete *trust*, which could not be revoked by afterwards giving notice to Thomas Weir not to invest the money in a home for Mrs. Sarah Jane Weir. As we have hereinbefore set out the testimony upon which we base this finding, we do not deem it necessary to refer to each circumstance herein mentioned bearing upon this question, but will proceed to cite a few authorities to sustain the views of the Court as to the law governing this case. In A. & E. Enc. of Law, vol. 8, page 1323, the law is thus stated: "The title to choses in action, as well as that to any other class of property, may be voluntarily transferred in another manner, without even a delivery, and that is by a declaration of trust. The title to a chattel can ordinarily be transferred by way of gift, as we have heretofore seen, by delivery of the article, actually or constructively, to the donee or to some person in trust for him. It is also possible for the donor to constitute himself a trustee for the donee. In order to do this, it is only

necessary for the owner, in clear and unequivocal language, or by acts amounting to the same thing, to declare that he henceforth holds the choses in action, or property, as trustee for the donee.   When this is duly executed by the owner, by an act intending to be binding on himself, equity will uphold it, whether the property be legal or equitable, or whether it be capable of transfer or not.   "If the trust is perfectly created, so that the donor or settler has nothing more to do to create it, and the party seeking to enforce it has no need of further conveyance from the settler, and nothing is required of the Court but to give effect to the trust as an executed trust, it will be carried into effect, although it was without consideration, and the possession of the property was not changed."   On page 1340 of the same volume it is said: "If the property is delivered to a trustee for the benefit of the donee, the trustee, if he accepts the trust, must execute it, and the *cestui que trust* has a good right of action against him if he does not.   The donor or settler has no control over it, unless some reservation is lawfully made in the trust.   So in case of a valid declaration of trust, like other gifts, when completely executed, it is irrevocable."   See, also, *Gadsden* v. *Whaley*, 14 S. C., 210;  *Caldwell* v. *Wilson*, 2 Sp., 75;  *Richardson* v. *Inglesby*, 13 Rich. Eq., 59.   When a trust is complete in its *creation*, it is not rendered revocable by reason of the fact that certain things remain to be done to carry its terms into effect. The creation must be *in presenti;* the execution of its provision may be, and generally is, *in futuro*.   The testimony does not show that Mrs. Sarah Jane Weir did, or failed to do, anything by which she was estopped from insisting upon the execution of the trust and the enjoyment of its benefits.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and the complaint dismissed.

MR. CHIEF JUSTICE McIVER.   I concur in result. ·